```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   BARTHELEMY SAMUEL JEAN DESSAINT,

 4                  Plaintiff,

 5          v.                              13 MC 99 (PI)

 6   CHRISTIE'S INC.,
                                            Argument
 7                  Defendant.

 8   ------------------------------x

 9                                          New York, N.Y.
                                            January 10, 2014
10                                          4:00 p.m.

11   Before:

12          HON. RICHARD J. SULLIVAN

13                                          District Judge

14

15          APPEARANCES

16
     CAHILL PARTNERS LLP
17        Attorneys for Movant Lignel
     BY:  JOHN R. CAHILL
18        RONALD ADELMAN

19
     EMMANUEL BARBAULT
20        Attorney for Movant Lignel

21
     SCHINDLER COHEN & HOCHMAN LLP
22        Attorneys for Plaintiff
     BY:  REBECCA L. FINE
23        MATTHEW KATZ

24

25
```

```
 1              (Case called)

 2              THE COURT:  This is in re the application of

 3    Barthelemy Samuel Jean Dessaint for an order pursuant to 28

 4    U.S.C. 1782 compelling production of documents and testimony by

 5    Christie's, Inc.  Let me take appearances and figure out who is

 6    who.

 7              For the petitioner, I guess we are calling you.

 8              MR. CAHILL:  We are the movant, your Honor, Jean-

 9    Charles Lignel.

10              THE COURT:  State your name for the record.

11              MR. CAHILL:  John Cahill from Cahill Partners.

12              THE COURT:  Good afternoon.  With you at counsel

13    table?

14              MR. ADELMAN:  Ronald Adelman, also from Cahill

15    Partners.

16              THE COURT:  Mr. Adelman.

17              Our French lawyer again?

18              MR. BARBAULT:  Emmanuel Barbault, B-A-R-B-A-U-L-T,

19    your Honor.

20              THE COURT:  Mr. Barbault.

21              MS. FINE:  Your Honor, on behalf of Barthelemy

22    Dessaint, Rebecca Fine of Schindler Cohen & Hoffman.  My

23    colleague Matthew Katz will be arguing this motion, but I am

24    very familiar with the French proceedings as well and may

25    address certain of those questions.
```

1          THE COURT:  Ms. Fine and Mr. Katz.  Good afternoon.

2          I have read the papers.  This is a case that came into

3     this court some time ago and was handled by Judge Wood while

4     she was on Part I.  The case now stays in Part I, it doesn't

5     follow the judge.  I did speak to Judge Wood.  She said she had

6     very little involvement in the case other than issuing the

7     initial order, so the case is with me.

8          I have read the papers in the interim, the memorandum

9     submitted by Mr. Cahill, as well as the declaration in support

10    of it.  I have the opposition memorandum as well.  I have read

11    all that.  I think I have a pretty good handle on all of this

12    here.

13         Who is going to be doing the arguing?  Mr. Cahill or

14    Mr. Katz?

15         MR. CAHILL:  I will, your Honor, yes.

16         THE COURT:  The first question I will begin with is,

17    why is this not moot?  It seems to me the documents have been

18    produced, the documents have been received by the French court,

19    the French court has got them in their possession.  If you want

20    to tell the French court not to rely on them, I guess you can

21    ask the French court to do that.  I don't see how I can order

22    the French court to give them back.  Go ahead.

23         MR. CAHILL:  Your Honor, we certainly wouldn't ask you

24    to do that.  That issue came up in the Hong Kong and I think

25    the Tokyo cases that we have cited.  I think it was Judge

1    Leisure said we can't tell the Hong Kong court what to do.

2         But the case is still a live case in France.  The

3    documents were used in connection with what I believe was an ex

4    parte application, but it is a live case.  The French court has

5    the documents.  We are not asking the Court to tell the court

6    what to do under French law, but we do believe this court is

7    not paralyzed and can do what was done in Hong Kong and say

8    these papers were obtained in violation of U.S. law.

9         THE COURT:  Isn't that really an advisory opinion?

10        MR. CAHILL:  No, your Honor.  We think there is a

11   distinction between an advisory decision, which presents a

12   hypothetical set of facts.  I probably have a citation to that

13   somewhere if your Honor is interested.  What happened here are

14   real events.

15        An application was made to this Court under section

16   1782.  It was an improper application.  A real subpoena was

17   served, a subpoena for which there was no notice given.  It is

18   hornbook law that I remember as a first year associate, the

19   beanie case happened with a Sullivan and Cromwell associate got

20   in big trouble for that.

21        We all know you can't serve a subpoena without giving

22   notice to the other side.  This Court can do what they did in

23   Hong Kong, say look, it was unlawfully served, we can't put the

24   toothpaste back in the tube, but we can't say it can't happen

25   again and we can say it was unlawful, and the French court will

1    do what it does with that information.

2           I do think this Court has the equitable power and is

3    otherwise empowered to say you can't come to this Court and ask

4    for relief that you have already been denied in a French court

5    and not tell us that, because 1782 --

6           THE COURT:  You're not asking me to exercise my

7    contempt power.  You're asking me really to exercise authority

8    under 1782, right?

9           MR. CAHILL:  Yes, essentially to vacate the order

10   under 1782 and also under Federal Rule of Civil Procedure 45.

11          THE COURT:  The 1782 order has already been issued and

12   it's already been complied with, the documents have already

13   been produced.  What is the point of vacating that order?

14   There is no suggestion that Christie's is going to be

15   submitting any more documents pursuant to that order, is there?

16          MR. CAHILL:  It could well.  There is always a

17   continuing obligation of a party to submit additional

18   documents.  But the Court could vacate that order.  This is,

19   again, precisely what's happened in a couple of cases where the

20   documents weren't properly obtained, and the court simply said,

21   yes, that order was improperly granted.

22          We think it may or may not have an effect on a French

23   court, but it certainly should have an effect in this court

24   because the alternative is a real invitation to mischief.  We

25   are all, I would like to think, most of the members of the bar,

1    including the fine firm that is representing the Dessaints,

2    good lawyers.  But nobody should be allowed to come and make an

3    ex parte application, serve a subpoena without notice, and then

4    have the Court just throw up its hands and say, well, you can

5    get away with that, and if you do, there is no consequence.

6         We think there should be some consequence.  Whatever

7    it may be, whatever effect it would have on the French court,

8    this Court should say, I'm vacating the order under 1782, it

9    was improperly obtained, and the documents were improperly

10   delivered because the subpoena was not served under Federal

11   Rule 45.  It violates due process, it violates 1782, it

12   violates --

13        THE COURT:  Are you suggesting the order was

14   improperly issued or are you saying that there should have been

15   notice after the order when the subpoena was issued?

16        MR. CAHILL:  Both, your Honor.  When I say it was

17   improperly issued, I don't mean any criticism of the court.

18   The court was given a boatload of papers and the papers

19   described the French court order inaccurately.

20        The Supreme Court has listed factors in the Intel case

21   that state what the court is supposed to do with a 1782 order.

22   In Intel they were addressing concerns that this was a big,

23   wide statute and there should be really specific criteria, and

24   the Supreme Court left it to the district courts to do that.

25        One of the factors is, is this order too intrusive?

1    Clearly, a request that seeks all documents, not just

2    concerning a limited sale, is too intrusive.  Is it an effort

3    to a circumvent, to do an end around a foreign court

4    proceeding?  If the Dessaints had asked a French court for the

5    same release, been denied, and had a direction to judicially

6    appointed experts, clearly that is an end-around, that is

7    impermissible.

8           So yes, we think if the court had had that information

9    in front of it, as it should have, a different order would have

10   been issued, so it was incorrectly issued.

11          THE COURT:  It didn't seem to me that the French court

12   was saying that you can't go get this other stuff.  It just

13   said what the scope of the inquiry would be in France, right?

14          MR. CAHILL:  No.  I think the court was very clear.  I

15   think this is an exhibit to my application, Exhibit D.  If you

16   look at page 4, the fourth starred paragraph is the request of

17   the Dessaints to authorize them to solicit Christie's or

18   Christie's New York.

19          Then, if you turn to the last page of that order, this

20   is Exhibit D to my declaration, the court, for the reasons in

21   the second large paragraph from the bottom, specifies the

22   extension of the mission of the experts in that it will be

23   their, meaning the experts', responsibility to collect from

24   Christie's, and so on, certain limited information, not all

25   documents.

1      THE COURT:  I get that.  You're suggesting that the

2    French court's order with respect to the experts was an

3    implicit limiting of evidence beyond that.  I'm not sure that

4    that is fair.  In any event, that could have been an argument

5    made to the French court when these documents were admitted.

6    Whether it was or not, I'm not sure.

7      MR. CAHILL:  That was ex parte, your Honor, so that

8    couldn't have been argued.  That was also done ex parte by

9    Dessaint, so there was no opportunity to argue that.

10      THE COURT:  There was an opportunity to say to the

11    French court, don't consider this stuff, they want to do and

12    end-run around your order.

13      MR. CAHILL:  Right, except they submitted the

14    documents to the French court also ex parte.

15      THE COURT:  All right.  But you are aware of this now,

16    you are back here.

17      MR. CAHILL:  The other thing, your Honor, just

18    briefly.  It is not just implicit.  On page 8 the court did say

19    that it would not allow any additional claims, including the

20    claim that the Dessaints listed what they sought that is

21    described on page 4.  Certain relief was granted.  On the last

22    page other claims were dismissed.

23      So the court specifically did deny.  The Dessaints

24    sought and were denied the right to do exactly what they came

25    to this court and did ex parte without notice.  They got every

1   piece of paper that they could from an auction house where

2   records are deemed confidential.

3         Just last month in a case called Jenack, the Court of

4   Appeals of the State of New York, said auction information is

5   confidential.  I have some insight on this.  Sometimes auction

6   houses are great record keepers and they have all the facts

7   right, sometimes they don't.

8         But there was no opportunity to address that, because

9   all of this, from soup to nuts, was done ex parte.  If that is

10  the law, then anyone can do it at any time and there is no

11  consequence.  We think the law is otherwise.  We are not asking

12  this Court to tell the French court anything other than this

13  isn't the way we do it here in the United States.

14        THE COURT:  You could easily get a U.S. law expert to

15  say that to the French court.  Maybe you have already done

16  that, I don't know.

17        MR. CAHILL:  I have tried to say it, but my

18  experience, at least in the U.S., is nothing beats a court

19  decision for what the law is.  We are not sure what the

20  admissibility of any opinions would be in the U.S.  It does

21  seem appropriate, if in fact as we think is clear, if U.S. law

22  and the federal rules and the Constitution were violated, for

23  this Court to say, as was the case in Hong Kong and Tokyo, we

24  are not sure what the foreign court will do with this, but we

25  are saying it was unlawful.

1          THE COURT:  Let me hear from Mr. Katz.

2          MR. KATZ:  Thank you, your Honor.  You hit the nail on

3     the head.  You are exactly right.  Basically, what Mr. Lignel

4     wants is he wants this Court to bolster an opinion that he

5     submitted a few weeks ago from the French court from his

6     counsel Mr. Cahill stating that the documents subpoenaed from

7     Christie's were obtained, quote, in violation of U.S. law.

8          Your Honor, I would like to hand a copy of the opinion

9     submitted by Mr. Cahill.  While we did not attach it to the

10    papers, I think it is important that it be in the record, and

11    we would like the Court to have a copy of it, if that is

12    acceptable.

13         THE COURT:  That's fine.

14         MR. KATZ:  Your Honor, while Mr. Lignel couldn't

15    explicitly seek an advisory opinion, instead what he purports

16    to do is he styles his motion as one to vacate the Court's

17    March 26th order.  But he neglected to mention the rules with

18    respect to that, and he clarified this in his letter to the

19    Court the week.

20         It is now apparent that he is seeking a motion to

21    vacate the order pursuant to Rule 60(b)(3) of the Federal Rules

22    of Civil Procedure.  That creates an insurmountable burden for

23    him.  He has to demonstrate by clear and convincing evidence

24    that Mr. Dessaint committed fraud, misrepresentation, or some

25    other misconduct on the court, and he has to demonstrate that

1    by clear and convincing evidence.

2            We cited in our brief the In re Braga case, and I want

3    to raise that for two reasons.  One, it demonstrates that if

4    you're going to bring a motion under Rule 60(b)(3), only

5    egregious misconduct is at issue.  The other reason that case

6    is important is because it is a situation very similar to here.

7    There were differing opinions as to the right to pursue

8    discovery in a foreign proceeding with respect to a 1782

9    application.  The court in that action held that that was not a

10    basis to vacate an order.  That is precisely the situation

11    here.

12            Mr. Lignel will have to show egregious conduct.  What

13    does he offer as proof of that?  One, he offers his opinion of

14    his counsel here in the U.S. of the order regarding only the

15    expert appraisers in France, and he references an opinion in

16    the Dessaint application regarding the efficacy of the

17    appraisal experts.  That is all he offers.  With all due

18    respect to Mr. Cahill, he is an able lawyer, thought very

19    highly of by our firm, he is not a French attorney and he is

20    not an expert in French law.

21            In contrast to that, Mr. Dessaint has submitted a

22    declaration of his counsel, who is a French attorney deeply

23    involved in the proceedings in France, and he states in

24    unequivocal terms that Mr. Dessaint's rights to pursue

25    discovery here in the U.S., right to pursue discovery

1    generally, are not implicated by the January 2013 order.

2         Further, the idea that Mr. Dessaint committed some

3    sort of misconduct here is belied by placing his opinion in the

4    application.  He was transparent in all respects.  The opinions

5    were fully disclosed, all the relevant opinions, and the

6    opinions were made in good faith.  That is demonstrated by the

7    fact that the appraisal experts didn't even contact Christie's

8    until two weeks ago.

9         There is one other thing I want to reference.  In

10   essence, Mr. Cahill is arguing that it is not that the evidence

11   is undiscoverable under French law but that the French court

12   has other procedures for gathering this evidence.  But it is

13   black letter law, it is crystal clear from Intel on down, that

14   1782 does not have an exhaustion requirement.  Accordingly, Mr.

15   Dessaint was not required to exhaust all his remedies in France

16   in order to obtain discovery here.

17        Likewise, the law is equally clear that there is no

18   limitation even if there were -- let me move on.

19        With respect to notice, it is clearly harmless error

20   here under Rule 61.  Even if we assume for a minute that Mr.

21   Lignel was denied proper notice, and we disagree with that

22   strenuously, but even assuming that is correct, it is harmless.

23   The Second Circuit recently issued an order, actually this

24   week, explaining that error is harmless when judgment is not

25   substantially swayed by the error.

1        There are several reasons why the outcome here would

2   not have changed even if Mr. Lignel had been given notice.

3   First of all, he had no standing to challenge the subpoenas.

4   Also, although co-counsel said it was, this was not ex parte.

5   1782 proceedings are often conducted ex parte.  Here Mr.

6   Dessaint provided notice to Christie's.  The court had an

7   opportunity to review the order to show cause.  Actually, they

8   modified the order to show cause to provide notice with respect

9   to those provisions.

10        THE COURT:  Notice to Christie's you're talking about?

11        MR. KATZ:  Notice to Christie's, correct.  In light of

12   that, it is a little misleading to describe these proceedings

13   as ex parte.  Mr. Dessaint sought documents from Christie's.

14   Christie's was notified and proceeded accordingly.

15        With respect to the harm, he didn't have standing to

16   challenge the subpoena.  First of all, with respect to the

17   scope and burden, he complains that the subpoena was burdensome

18   and vast in scope.  I think plain reading of the subpoena

19   demonstrates that not to be the case.  But it is clear that he

20   did not have standing to challenge that.  That was only

21   Christie's right to do so.

22        Also, he is not claiming privilege in the documents.

23   He is not able to do so.  To the extent that any confidential

24   information is implicated, the case law makes clear that the

25   probative value of that evidence vastly outweighs any privacy

1    concerns implicated here.

2            When push comes to shove, what is at issue here is he

3    would have preferred that the evidence demonstrated by these

4    documents, the documents themselves would not have been

5    produced because they demonstrate a massive fraud on the court

6    and on to Louise Lignel-Delaroche.  But the documents were

7    disclosed, they were properly disclosed, and they bear directly

8    on and go to the heart of the issue in the French litigation,

9    which is whether Mr. Lignel committed fraud.

10           Second, Mr. Lignel was not harmed because the

11    application itself was properly granted.  There is no dispute

12    that the prerequisites under the statute have been satisfied

13    here.  Christie's is located in the district.  Discovery was

14    for use in the French proceeding.  And Dessaint is a

15    participant in the action as an interested person.  In fact,

16    this case is a quintessential example of the purpose of the

17    1782 statute.  Likewise, the discretionary factors in Intel

18    weigh decisively in favor of granting the application.

19           Mr. Dessaint submitted, as I said, a declaration

20    demonstrating that he was not circumventing any discovery

21    limitations in France.  But putting that aside, even assuming

22    that is not the case, there are other factors that weigh

23    decisively in Dessaint's favor.

24           For example, they looked into whether the entity from

25    whom discovery is sought is within the jurisdictional reach of

1   a foreign tribunal.  In this case the documents were here, the

2   relevant persons were here, they were not subject to French

3   jurisdiction.

4          Another factor is whether the foreign tribunal is

5   receptive to judicial assistance.  Here it demonstrated clearly

6   that they were receptive to it.  Even the disputed January 2013

7   order demonstrates that.  The court specifically requested and

8   was interested in obtaining documents from Christie's.

9          THE COURT:  Have there been any documents produced

10   since April 8th by Christie's?

11          MR. KATZ:  No.  They talk about burden.  In total I

12   think there was 170 pages total produced, give or take.  I

13   think on its face that demonstrates or that certainly calls

14   into question the burdensome nature of the request.

15          With respect to whether the Court was receptive to it,

16   as noted in our papers, the court had already relied on the

17   information that was produced.  It relied on information about

18   Mr. Lignel's property in France.  The idea that the French

19   court would not be receptive to receiving this information is

20   just incorrect.

21          Ms. Fine noted that they also denied Mr. Lignel's

22   request to suppress the evidence.

23          THE COURT:  A suppression motion was already made in

24   the French court.

25          MR. KATZ:  That's correct.

 1          THE COURT:  Mr. Cahill, is that really the thought,

 2    that a good scathing opinion from me along the lines of the one

 3    that was issued 30 years ago, 20 years ago I guess, in the Hong

 4    Kong case would do the trick to maybe get them to reconsider?

 5          MR. CAHILL:  No, your Honor.  And I can't concede, if

 6    I don't think it is correct, that there was a suppression

 7    motion made in France.  I think this is a live question in

 8    front of a French court now as to whether this evidence should

 9    be considered by a French court.

10          What the French court didn't know is that Mr. Dessaint

11    came to the United States and did what no United States party

12    could ever do.  Yes, you can make an ex parte 1782 application,

13    but 1782 and this Court itself required notice be given to Mr.

14    Lignel, and it was not.

15          THE COURT:  I'm looking at the March 26th order.

16    Where does it say that?

17          MR. CAHILL:  Section 1782 says if the court --

18          THE COURT:  I'm just asking about the order.  The

19    order doesn't say anything about giving notice to Mr. Lignel,

20    right?

21          MR. CAHILL:  No, it does not say anything about giving

22    notice to Mr. Lignel.  But by virtue of having not been

23    requested and not having prescribed a different procedure,

24    under 1782 and the case law the federal rules apply.  The

25    federal rules and the ethical rules and the constitutional

1    rules were simply not observed.

2           THE COURT:  I get that argument.  Judge Wood so

3    ordered the stipulation and order that Christie's and Dessaint

4    submitted to her back in March.  That basically called for

5    Dessaint to serve Christie's with subpoenas, Christie's to

6    begin proceeding responsive documents by April 1st, make its

7    best efforts to complete the production by April 8th, and then

8    provide an affidavit to accompany its production responsive to

9    Christie's subpoena.

10          I'm not clear that anything has taken place after

11   that.  I guess that's what I'm trying to figure out.  You're

12   asking me to vacate a March 26th order that seems to be already

13   done.

14          MR. CAHILL:  No, the judge directed that the order be

15   served.

16          THE COURT:  What are you referring to?

17          MR. CAHILL:  I'm sorry.  That the subpoena be served.

18   Again, this was a stipulation prepared by Dessaint, not by the

19   court.

20          THE COURT:  But the court signed the order, so it is

21   the court's order.

22          MR. CAHILL:  Yes.  The second page of the order, in

23   the paragraph enumerated 1, says for Dessaint be permitted to

24   serve the Christie's subpoena attached hereto.  The court was

25   entitled to rely on good lawyers who would follow the federal

1   rules.  When the subpoena is permitted to be served, it is not

2   only served on Christie's, it is served on the interested

3   parties.  If that isn't the rule, then we are all in big

4   trouble.

5           THE COURT:  It was already served.  The subpoena was

6   served on Christie's, no question about that, right?

7           MR. CAHILL:  No, the subpoena was not served on

8   Christie's at the time.  There was an order to show cause

9   served on Christie's.  This order authorized Dessaint that

10   Dessaint be permitted to serve the Christie's subpoena.

11           THE COURT:  Which it did, right?

12           MR. CAHILL:  It did, but it did not do it on Lignel,

13   which it was required to do under Federal Rule 45.

14           THE COURT:  I get that.  You said this order required

15   service on Lignel.  It doesn't make any mention of Lignel.  It

16   just says Christie's can serve the subpoena.

17           MR. CAHILL:  Yes.

18           THE COURT:  The subpoena was served, Christie's

19   produced documents.  The documents had been produced well over

20   six months ago, right?  There is no ongoing production.  There

21   is nothing else going on in this case.  You are asking me to

22   vacate the March 26th order.  There is really nothing to

23   vacate, right?  There is no ongoing production, there is no

24   ongoing activity, right?

25           MR. CAHILL:  The order was improperly granted, because

E1cxdexm

1    it didn't follow correct practice.

2            THE COURT:  I get that argument.

3            MR. CAHILL:  It wasn't complied with in that the

4    subpoena --

5            THE COURT:  That's what you really want me to say.

6    You want me to otherwise indicate to a Paris court that

7    documents obtained thereby were obtained in violation of United

8    States law.  That's what you want me to do.  Vacating the order

9    doesn't really do anything.

10           MR. CAHILL:  To the extent that the federal rules also

11   require ongoing compliance with the subpoena.  But the statute

12   is very clear that if the order doesn't prescribe otherwise,

13   the document or other thing produced must be produced in

14   accordance with the Federal Rules of Civil Procedure.

15           So yes, what I would like the Court to do is to say

16   yes, this Court has rules, it's got a constitution, it's got a

17   statute, it's got the Federal Rules of Civil Procedure, they

18   weren't complied with, and in the future we are not asking you

19   to tell the French court what to do, we are asking you to tell

20   Dessaint you shouldn't have done it, you can't do it again, and

21   you can't continue to get information from Christie's.

22           THE COURT:  Your suggestion is they could now get

23   information from Christie's without a subpoena, they could go

24   to Christie's and say, we want some additional stuff?

25           MR. CAHILL:  Absolutely.

E1erdesm

```
 1          THE COURT:  Beyond what is in the subpoena?  That's
 2   not at all clear to me.  You don't think they would have to get
 3   another 1782 order?
 4          MR. CAHILL:  I'm not saying Christie's has, but if
 5   Christie's had failed to provide all the documents responsive
 6   to the subpoena, they could go back and say there is a live
 7   subpoena that hasn't been quashed and you have a continuing
 8   obligation.
 9          THE COURT:  You're asking me to vacate an order
10   because conceivably, although not actually, there could be a
11   hypothetical situation where Christie's would still have to
12   produce documents under that subpoena that was issued pursuant
13   to that order.  There is no facts that would suggest there is
14   anything left to be done under the subpoena or under this
15   order, right?
16          MR. CAHILL:  Again, we are asking that the Dessaints
17   be prohibited from seeking further documents under that order.
18   We are also asking that the Court vacate the order as
19   improperly granted under 1782.  I know the Court has heard that
20   argument.  I don't want to repeat it.
21          THE COURT:  I get it.  Seems to me that is really an
22   advisory opinion.  You are asking me to advise the French court
23   because I'm going to be more persuasive authority than some
24   American lawyer submitting an affidavit.
25          MR. CAHILL:  Your Honor, again, if you permit me, the
```

1    Supreme Court has distinguished an advisory opinion from a

2    permissible one.   The language of the Supreme Court is that a

3    permissible decision that is not an advisory opinion must

4    resolve a real and substantial controversy.

5            THE COURT:   What is the controversy here?

6            MR. CAHILL:   The controversy here is whether a foreign

7    litigant can come into this court.

8            THE COURT:   That is not a controversy.   There is

9    really no controversy.   Nobody is asking that this subpoena be

10   complied with now.   What you are asking is for me to go back

11   and say it should have been done a different way.   But that is

12   not a controversy.   That's just asking me for a legal opinion

13   as to what went on before.

14           If you were here seeking to hold the other side in

15   contempt, that might be a different story, I suppose.   But you

16   are not doing that, right?

17           MR. CAHILL:   No, we have not sought contempt, your

18   Honor.   We are asking the Court to vacate the order and to

19   address the subpoena that was blatantly and improperly, and

20   unethically, frankly, served.   This violates all kinds of

21   rules.   We didn't come back and seek contempt.

22           We are not asking this Court to do anything other than

23   what courts in this district have done in the past when similar

24   actions have been improperly taken, which is to say we are

25   going to say they have been improperly taken, and to the extent

1      we can prevent further damage --

2              THE COURT:  You're talking about the Hong Kong case,

3      where a court that has no binding authority on me ordered the

4      suppression of documents produced pursuant to a subpoena.

5              MR. CAHILL:  In Tokyo I believe the court also

6      directed that further depositions could not be taken without --

7              THE COURT:  That is a little different.  Further

8      depositions is different.  You're asking me to suppress

9      documents that were submitted pursuant to the subpoena?

10             MR. CAHILL:  No, your Honor.  The documents are

11     already in the French court.  We are asking the Court to say

12     they were unlawfully obtained and that the Dessaints cannot

13     take further action pursuant to a subpoena that was served in

14     violation of the law, the rule, and the court's order which are

15     required to be served under the federal rules.

16             THE COURT:  Mr. Katz, anything you want to say in

17     response?

18             MR. KATZ:  A few things.  One, I want to point out

19     that, first of all they have waited nine months to do this.  We

20     are pushing up against the deadline of January 21st, I believe

21     is the deadline in France.  I don't know why they waited nine

22     months.

23             THE COURT:  I don't know when they learned about this.

24     When did you learn about this, Mr. Cahill?

25             MR. CAHILL:  When did I learn about it?

E1exdesm

```
 1            THE COURT:  When did your client learn about it?

 2            MR. CAHILL:  My client, I'm not certain, your Honor.

 3   He learned about it at some point after an ex parte seizure

 4   order was issued in France.  Although they have put a lot of ad

 5   hominem in, he is not familiar with U.S. law.  He only recently

 6   discovered that you can't serve a subpoena without notice to an

 7   interested party.

 8            MS. FINE:  Your Honor, the Court received the

 9   documents from Mr. Dessaint in April of last year and

10   subsequently had an opportunity to review those documents, and

11   on that basis seized certain of Mr. Lignel's assets in France.

12            With respect to the discussions about the subpoenas,

13   we are willing to submit that we don't have a need for a

14   subpoena at this time and it is not something that we had

15   anticipated we would seek.  We do have a company business

16   records affidavit from the people who produced those documents.

17            THE COURT:  The affidavit that accompanied the

18   production of documents that was part of what Judge Wood

19   ordered on March 26th, what did that consist of?  Does it talk

20   about an ongoing obligation to proceed?

21            MS. FINE:  No, it does not.

22            THE COURT:  Is that in the record?  Do I have that?

23            MS. FINE:  They made a rolling production over a

24   period of several weeks in the spring of last year.  Then

25   discovery concluded.  We were in touch with Christie's for
```

1    about three weeks, and the document production was completed.

2           MR. CAHILL:  Your Honor, if I may address that one.

3    Factually, the stipulation and order contains the subpoena as

4    an exhibit.  Like most subpoenas served by good lawyers, it has

5    an instructions section.  In the instruction section, number 11

6    is that the request shall should be continuing and any document

7    obtained or located after the production which would have been

8    produced had it been available or its existence known at that

9    time is to be supplied immediately.  Withdrawing that right

10   here on the day of this application I don't think is sufficient

11   to deny the Lignel application.  Christie's isn't even here.

12          MS. FINE:  To be clear, we stipulated that we would

13   not require the depositions that we had sought in the original

14   application.  That was incorporated in the stipulation and

15   order that was submitted and so ordered by the court on the

16   26th.

17          THE COURT:  The affidavit that is referenced which was

18   produced with the documents.  That is not part of the record

19   before me, right?

20          MS. FINE:  We did include the entire production from

21   Christie's, which included the one-page business records

22   affidavit.  That was submitted in France as piece number 21.

23   It was submitted in Mr. Buge's 2014 declaration.

24          THE COURT:  You're saying it's in the record before me

25   on this motion?

1          MR. KATZ:  Yes.  I think it is Exhibit 3, in

2     Exhibit 3.

3          THE COURT:  I think I left that upstairs.

4          MR. CAHILL:  Exhibit 3 to what, Mr. Katz?

5          MR. KATZ:  To I think the 2014 --

6          THE COURT:  I left it upstairs, actually.  I hadn't

7     planned on being on the bench the whole time.  I had some other

8     things.

9          MS. FINE:  I can show the Court.  It is the

10    declaration of counsel for Christie's.

11         THE COURT:  It doesn't talk any more about whether

12    there is an ongoing.

13         MS. FINE:  No.

14         MR. CAHILL:  Your Honor, if I may, the withdrawal of

15    the depositions was itself prejudicial to Lignel and done

16    without notice.  Perhaps the Christie's witnesses could have

17    testified that these documents are not accurate or that they

18    have no personal knowledge of the information that was used.

19    Again, all this was done in violation of the most fundamental

20    principle of our jurisprudence, without notice to Mr. Lignel.

21    What would the harm have been of simply telling him?

22         THE COURT:  I don't know what the harm would have

23    been.  I'm not sure it is the most fundamental aspect of our

24    system.  Again, it does seem to me that all of this is really

25    designed to get me to say something that can then be used to

1    wave in front of a French court, and I think that is not really

2    what this process is supposed to be for.

3         1782 is basically designed to make sure that I

4    authorize the production of documents that are contemplated for

5    purposes of foreign tribunals, and it is also designed to make

6    sure that where there is overreaching, the court can stop it

7    before it happens.  But I don't know that it is designed so

8    that courts can go back and take a look and decide, hm, that

9    shouldn't have happened that way.  I can't think of other

10   situations where that happens.

11        There is post-conviction relief in criminal cases all

12   the time.  You don't go back to the judge who issued the search

13   warrant to say, knowing what you know now, to you think it was

14   done properly.  You usually don't go to courts to get that kind

15   of post hoc explanation or revisiting of an issue.

16        MR. KATZ:  Your Honor, I didn't get to finish before.

17   Mr. Cahill keeps asserting that it is absolutely crystal clear

18   that the law is that notice is required under 1782.

19        THE COURT:  1782 says that the Federal Rules of Civil

20   Procedure shall apply unless clearly noted otherwise.  There is

21   nothing to suggest that it has been noted otherwise, is there?

22        MR. KATZ:  The March 26th order taken in conjunction

23   with the order to show cause, which specifies to whom service

24   is proper and necessary, I think that provided the direction

25   necessary to give us direction as to whom to serve.  But the

1    cases themselves only show that the courts have discretion to

2    require notice.

3          THE COURT:  If you had said to Judge Wood, we don't

4    need to serve these other folks the way we would under Rule 45,

5    and she had said no, don't bother, that would be one thing.

6    But nobody asked her that, right?

7          MR. KATZ:  That's true.  The other thing worth noting

8    is the statute itself.  It says, the testimony or statement

9    shall be taken and the document or other thing produced in

10   accordance with the federal rules.  So I think it is perfectly

11   reasonable, it is certainly in good faith, to understand that

12   to mean that the subpoena process, the production of documents

13   in connection with it, would be done pursuant to the federal

14   rules.

15         The cases that he cites, they certainly demonstrate

16   that the courts have discretion to require notice.  But I

17   haven't seen anything affirmatively stating that 1782

18   absolutely requires in all circumstances notice to an

19   interested party in a foreign proceeding, particularly where,

20   as here, that interested party had no standing to challenge the

21   subpoena at issue.

22         MR. CAHILL:  Your Honor, the last sentence of 1782

23   says exactly that.  As your Honor just said, to the extent it's

24   not prescribed by the court, the federal rules apply.  Again,

25   it is federal rules and it is also basic ethical rule.

1          THE COURT:  Basic ethical rules?

2          MR. CAHILL:  Yes.  I believe that Sullivan & Cromwell,

3    back when I was a first year associate, was seriously tagged

4    with an ethics violation for not serving an interested party

5    with notice of a deposition and getting confidential documents.

6          THE COURT:  In a 1782 situation?

7          MR. CAHILL:  No.

8          THE COURT:  The line says to the extent that the order

9    does not prescribe otherwise, the testimony or statement shall

10   be taken and the document or other thing produced in accordance

11   with the Federal Rules of Civil Procedure.  It doesn't say that

12   the subpoena shall be issued in accordance with federal rules.

13   It is a little more ambiguous than that.  It sounds like the

14   thing to be produced, whether it is a document or testimony,

15   will be taken in accordance with the Federal Rules of Civil

16   Procedure.  There is no express discussion about notice to

17   third parties, right?

18         MR. CAHILL:  No.  But Federal Rule 45 is explicit

19   about that, that you have to give notice to interested parties.

20   That is just as clear as it could be.  If it wasn't and if

21   there is no consequence here, and I suspect it will happen with

22   some frequency, a foreign litigant can come into this court

23   having been denied relief in a foreign court, and get an ex

24   parte order.

25         That is certainly something you are entitled to do

E1exdesm                                                                            29

1    under 1782.  But the reason you are entitled to do it is

2    because, as has been said in other cases, the federal rules

3    require notice under the procedure or the court has to

4    determine that no notice is required.  Otherwise, what you are

5    going to have is people can come in, get an ex parte order,

6    serve a subpoena without notice.  If the answer is, hey, it's

7    too late to do anything about it, why would anyone serve notice

8    under those circumstances?

9              THE COURT:  If you had had notice, what would you have

10   argued to Judge Wood?

11             MR. CAHILL:  We would have argued that under Intel and

12   under basic principles, a subpoena that seeks all documents --

13             THE COURT:  Overbreadth you would have argued.

14             MR. CAHILL:  Especially since we are talking about an

15   auction house where millions of dollars are involved, where

16   bank accounts are involved, where private information is

17   collected by the auction house involving sales and property

18   having nothing to do with this.

19             The French court order was involving a single sale.

20   They asked for everything.  We also would have said to Judge

21   Wood, Judge, you're a busy judge, this is an adversary process,

22   Christie's and Dessaint are not adversaries, take a look at the

23   French court order.  They asked for it from a French judge,

24   they were turned down.  The French judge said, experts, you do

25   it, if you have a problem, come back to me, the French court.

 1              You ought to look at that under the Intel factor where

 2    it says you could do an end-around.  You certainly shouldn't

 3    say, Judge, that they could have the private information of an

 4    auction house, because there is a lot of private information

 5    there.  They don't need it.

 6              THE COURT:  You said Sullivan and Cromwell got in a

 7    lot of trouble for this, as I recall it.

 8              MR. CAHILL:  Yes.

 9              THE COURT:  That was in the context of what?  A

10    contempt motions, sanctions motions?

11              MR. CAHILL:  I believe it was a sanctions motion.

12              THE COURT:  But no sanctions motion has been made

13    here.

14              MR. CAHILL:  That is true.

15              THE COURT:  Why not?  Wouldn't that solve the problem?

16              MR. CAHILL:  It would not.

17              THE COURT:  Why not?

18              MR. CAHILL:  It might punish the wrongdoers.

19              THE COURT:  Wouldn't that be the best way to prevent

20    future wrongdoing?  You have articulated the need to have

21    general deterrence as one of the reasons why I should grant you

22    the relief you are talking about.

23              MR. CAHILL:  Among other reasons, the timing of this

24    doesn't permit all the safe harbor provisions of Rule 11.

25              THE COURT:  The timing of what?

```
 1            JUROR NO. 13:  The expedition with which we need to
 2   proceed to try and deal with this issue.
 3            THE COURT:  What you really want this for is not to
 4   punish them and not to deter future wrongdoers, it is to try to
 5   persuade a court in France of something that your expert can
 6   presumably say just as easily as I can, it's just that mine has
 7   a stamp on it, right?
 8            MR. CAHILL:  No, your Honor.  I do mean this genuinely
 9   as an officer of this court.  I do find this conduct, with all
10   due respect to my esteemed counsel, absolutely outrageous.
11            THE COURT:  Why does the timing matter as to whether
12   or not you would file a sanctions motion?
13            MR. CAHILL:  Because, as your Honor has pointed out,
14   one of your Honor's concerns is that the toothpaste is out of
15   the tube, you can't unring the bell.
16            THE COURT:  Sanctions, he doesn't care about that.  A
17   sanctions motion would be focused on, well, it's too late now.
18   A sanctions motion would be whether or not they did something
19   that is improper and ethically improper, as you have said.  You
20   understand why the amount of time between now and when the shoe
21   is going to drop in France would affect that.
22            MR. CAHILL:  Your Honor, I have to say I was focused
23   on the relief and the actions taken by other courts under
24   similar circumstances.  Perhaps I should have and perhaps still
25   should consider a sanctions motion and other action.  But when
```

1    I looked at the law, I saw that other district courts faced

2    with similar circumstances had acted in the sense that they had

3    declared that the procedure had been violated.

4          What happened in those cases I have no idea and there

5    is no way to find out.  But it does seem appropriate, not just

6    from a deterrence value but because this goes to the integrity

7    of this Court and the judicial process in which we all believe

8    very seriously, that there is something fundamentally wrong.

9          THE COURT:  I get that, and then you get back on your

10   soapbox.  What you are telling me is you don't want to punish

11   them and you don't care what happens the next time, you just

12   really want advantage in a French litigation.  Get off the

13   soapbox about that.  That is really a tactical decision that

14   you are making, but it doesn't implicate these other issues of

15   notice and fair play and the American flag.  Right?

16         MR. CAHILL:  Your Honor, you're right that I want an

17   outcome that is good for my client in this case.  But I think

18   getting an outcome that is good for my client in this case

19   would have a positive effect on the jurisprudence in this area,

20   and the opposite, a negative outcome for my client, would have

21   a very negative effect on the jurisprudence in this area.

22         It is one of these things where, yes, I fully confess

23   I'm here for my client, for what is best for him, and what is

24   best for him is for this unlawful action to be declared

25   unlawful and for this Court to vacate the order.  But I think

1   that, like a lot of cases, it has ramifications beyond the

2   parties and beyond the issues in this case.  I do think that is

3   important, and I mean it genuinely, but freely admitting that

4   my client is my first priority.

5           THE COURT:  I understand.  I am going to reserve for a

6   little while.  I want to think on these points you have made in

7   your arguments and in your papers.  I will issue a ruling in

8   the short term.  We'll get in touch with you as soon as we do

9   that.

10          MS. FINE:  Your Honor, I just want to reiterate that

11   the application was made in utmost of good faith based on

12   opinion from French counsel with respect to Mr. Dessaint's

13   right to pursue discovery in the United States.  We were

14   fulsome in our disclosure to the Court with respect to what we

15   anticipated the documents would show, whose interests would be

16   adversely affected.

17          To be sure, we knew that Mr. Lignel would be unhappy

18   with the revelation of this fraud.  But we were absolutely

19   clear with the court, with Judge Wood, these documents we were

20   seeking related to Mr. Lignel and his dealings with Hasegawa.

21   She had the opportunity to review the order in both cases.

22   They were sub judice for at least a day before she signed them,

23   and at no point did she express the desire that we give notice

24   to Mr. Lignel.

25          I want to address the point the Court has raised with

1    respect to the prospect of any wrongdoing on the part of my

2    client or my firm and assure the Court that we acted in the

3    utmost good faith and did not believe that we were required to

4    provide notice to Mr. Lignel.

5                THE COURT:  Do you still believe it?

6                MS. FINE:  Yes.  We believe that the Court had

7    discretion to do so.

8                THE COURT:  Do you think that Judge Wood, in signing

9    the order that was proposed, put before her, was basically

10   saying and you needn't follow the rules of civil procedure

11   going forward?

12               MS. FINE:  We did not feel the cases, the decisions,

13   and the jurisprudence required us to give notice to all

14   interested parties.

15               THE COURT:  It's the language of 1782 that I think

16   really applies.  That says unless other specified, it should be

17   in accordance with the Federal Rules of Civil Procedure.  I

18   can't give you the exact quote, but I don't think there is any

19   dispute about what it is.

20               MS. FINE:  We fully appreciated that the federal rules

21   would pertain with respect to the production of documents and

22   the subpoena.  We did.

23               THE COURT:  But not notice?

24               MS. FINE:  Not with respect to the order to show

25   cause.  In other words, we understood that the production of

1   documents and any proceedings in connection therewith would be

2   governed by the rules of civil procedure.

3           THE COURT:  I will reserve.  Thank you.  It was

4   interesting.  It was certainly an interesting exchange, good

5   lawyers making good arguments.  It was a real pleasure, the

6   back-and-forth and hypothetical.  I push a bit because I'm a

7   New Yorker.  Nothing personal.

8           MR. CAHILL:  We appreciate the Court hearing us, your

9   Honor.

10          THE COURT:  I'll be in touch.  Have a good weekend.

11  Let me thank the court reporter.  If anyone needs a copy of the

12  transcript, you can take that up with the court reporter.

13          (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25